Filed 3/6/25  P. v. Roberts CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>v.<br><br>DYLAN ROBERTS,<br><br>  Defendant and Appellant. | A169695<br><br>(Humboldt County<br>Super. Ct. No. CR2202204) |

After pleading guilty to robbery and assault, defendant Dylan Roberts appeals on the ground the trial court improperly denied his request for pretrial mental health diversion under Penal Code section 1001.36.[1]  We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

*The Charged Offenses*

Defendant was charged with assaulting or battering three people, robbing one, and damaging a jail.  According to evidence at the preliminary hearing, on August 8, 2022, defendant approached one of the victims, Michael G.,[2] as he was walking down the street and punched him, causing him to fall

---

[1] All statutory references are to the Penal Code.

[2] In the interest of privacy, we refer to the victims by their first names, intending no disrespect.

1

over. Michael suffered cuts and bruises, a broken jaw, a broken nose, and a fractured hip. Defendant punched a second victim, Phillip A., in the face. He approached a third victim, Roger K., with clenched fists in a parking lot as Roger was loading groceries into his vehicle, punched Roger in the face, and took a case of beer from him, saying, " 'I'm taking my beer, mother fucker.' " When Roger followed him, defendant said to him, " 'You punk ass bitch, I'm the man; I'm the man,' " and tried to charge at him. Video surveillance showed defendant also pushed an additional, unidentified, victim in the parking lot.

Defendant was arrested that day and sent to the county jail. While in a holding cell, he punched another inmate, Justin Q., several times. When he was placed in a cell on his own, he hit the window, causing it to break.

Defendant later reported he had blacked out from methamphetamines at the time of the offenses. Based on his alleged actions, defendant was charged with seven counts: felony second degree robbery of Roger K. (§ 211; count 1); felony assault on Michael G. with force likely to produce great bodily injury (§ 245, subd. (a)(4); count 2), with a special allegation that he inflicted great bodily injury on a victim 70 years of age or older (§ 12022.7, subd. (c)); misdemeanor assault and battery on Phillip A. (§§ 240, 242; counts 3 & 4); misdemeanor assault and battery of Justin Q. (§§ 240, 242; counts 5 & 6); and misdemeanor damaging a prison or jail (§ 4600, subd. (a); count 7). As to counts 1 and 2, the information also alleged the crimes involved great violence, great bodily harm, or threat of great bodily harm, and that the victim was particularly vulnerable. (§ 1170, subd. (b)(2).)

***Motion for Mental Health Diversion***

In April 2023, before trial, defendant brought a motion for mental health diversion under section 1001.36, arguing that he suffered from

multiple mental health disorders that played a significant role in the charged offenses and that the disorders were reasonably treatable.

### *Dr. Kelly's Opinions*

In support of his motion, defendant attached a report by a licensed psychologist, Kevin T. Kelly, who had examined defendant in April 2023. Dr. Kelly diagnosed defendant with three conditions that were significant factors in the charged offenses: substance abuse disorder, schizophreniform disorder, and "Cluster B type, Borderline and Antisocial" personality disorder. As treatment, he recommended residential rehabilitation for substance abuse disorder, followed by intensive substance abuse treatment; psychiatric medication; counseling for anger management; and case management.

According to Dr. Kelly's report, while in jail soon after his arrest, defendant broke the window to his cell, crawled out, and wandered the unit making "grandiose statements," and he reported to a psychiatrist that he was " '[t]he Messiah,' " with a " 'special message to deliver to everyone.' " Defendant told another doctor he was a " 'great man' " and had made the Golden Gate Bridge of " 'diamond metal.' "

In September 2022, while in custody after the charged offenses, defendant had been diagnosed with "mixed, severe" bipolar disorder, schizophrenia spectrum and other psychotic disorder, and substance abuse disorders, in remission in a controlled environment. He was taking prescribed psychiatric medications at the time of Dr. Kelly's report, and said he was no longer hearing voices. He reported a history of using alcohol, marijuana, methamphetamine, heroin, and psychedelics, and said he had suffered brain injuries in the past.

Defendant experienced auditory and visual hallucinations, which began about a year previously, when he was 23 years old, at the time he began using methamphetamine. He also reported blackouts lasting days or weeks, which he attributed to his methamphetamine use, as well as psychosis, " 'like I'm seeing shadows.' " According to Dr. Kelly, blackouts are not commonly associated with methamphetamine use, and Dr. Kelly opined that defendant had likely experienced psychotic breaks, probably induced by methamphetamine, which can trigger underlying schizophrenia. Defendant reported that he had been taking medications for seven months while in jail and that they were working well.

Defendant acknowledged to Dr. Kelly that he had " 'hurt [three] guys in the community and [one] while at booking,' " said he had " 'never been that way before,' " and said he did not know why he was " 'angry with the world.' " He said he had no memory of those events.

Defendant's mother had confirmed that he suffered auditory hallucinations and delusions.

Dr. Kelly opined that defendant acted irrationally at the time of the offense due to schizophreniform disorder, bipolar disorder, or methamphetamine induced hypomania. Antisocial and borderline features were significant parts of his personality, but he likely would have managed those symptoms more peacefully, but for his schizoid and bipolar processes and his methamphetamine induced psychosis.

According to Dr. Kelly, defendant's mental health disorders were treatable, with treatment for the personality disorder "ancillary to direct treatment" for his other disorders, and there was good reason to believe treatment over a two-year period would control his symptoms so as to prevent further offenses. Dr. Kelly recommended a "dual diagnosis treatment plan of

4

residential substance use treatment accompanied by psychiatric medication, counseling, and anger management to treat co-occurring mental health symptoms." However, if defendant began using substances again or ceased taking his medications, he might act violently and unpredictably toward others.

Dr. Kelly testified at a July 24, 2023 hearing on defendant's motion for mental health diversion. He explained that he labeled defendant's personality disorder under "cluster B" because there were elements of both antisocial personality disorder and borderline personality disorder, with a degree of narcissism. Although personality disorders are not directly treatable with psychiatric medications and not particularly responsive to counseling, abstinence from substances and substance abuse treatment could "do quite a bit" to mitigate the effect of personality disorders on a person's behavior, and antipsychotic medication could reduce the person's agitation, further reducing the likelihood of "act[ing] out."

Dr. Kelly opined that defendant posed a risk of violence "during an acute period" of both intoxication and experiencing symptoms of schizophrenia and personality disorder, and that the risk of violence was "greatly reduced perhaps" with treatment. To achieve that goal, Dr. Kelly opined that defendant should be sober and abstinent for a "long period" and receive "extensive inpatient rehabilitation," followed by an intensive outpatient substance abuse treatment program.

Dr. Kelly could not specify the roles defendant's substance abuse, mental illness, and personality disorders variously played in the charged offenses; each of those diagnoses could have resulted in his behavior, and he considered each a significant factor in the charged offenses. He noted, however, that those offenses represented the only time defendant's mental

5

health problems had resulted in violence, which would be unusual in someone with a "more severe level of antisocial personality disorder or bipolar disorder." Defendant appeared to be motivated to make use of treatment, and if he were medicated, abstinent from alcohol and drugs, and supervised by a clinician, he would not create an unusual danger from violent outbursts.

Evidence at the hearing also showed that before the crimes at issue, defendant had attended an inpatient rehabilitation program at Waterfront Recovery Services (Waterfront) and participated in drug and alcohol counseling and an anger management program.

### *Hearing on Motion and Trial Court's Ruling*

The trial court acknowledged that there was "pretty clear evidence" that defendant's mental disorders were a substantial factor in the commission of the offenses. But, it went on, defendant was dangerous to the community if untreated and he needed significant supervision to prevent further random acts of significant violence. The court explained that the Department of Health and Human Services would not be willing to provide defendant with services in the community, due to his dangerousness and to difficulties in obtaining funding, and that the probation department would be unable to provide an adequate level of supervision in the community.

At a further hearing a few days later, the trial court concluded the evidence did not show defendant would be likely to commit a "super strike" if placed on diversion, and it found he was eligible for diversion. However, the court explained, defendant would be a danger to the community if he began using substances again or failed to comply with his treatment or medication, and any treatment program would have to address his personality disorder and provide "some significant amount of supervision." The court gave

6

defendant the opportunity to "come up with [a] treatment program" that would be suitable.

Defense counsel informed the court he had identified a year-long multi-phase program, Visions of the Cross, which had inpatient, intensive outpatient, and sober living components. At a further hearing on October 9, 2023, however, counsel said that he had been unable to secure a long-term dual-diagnosis program for defendant, in part because defendant was unable to attend an intake interview while in custody. Waterfront, the only program to which defendant had been accepted, was limited to 90 inpatient days, and defense counsel acknowledged it did not satisfy the court's requirements.

The court denied defendant's motion for mental health diversion. It concluded that, while the offenses charged resulted from defendant's mental health issues, defendant posed a sufficient danger to the community that he required a level of supervision Waterfront could not provide, and that no suitable program was available.

### *Plea, Verdict, and Sentencing*

On December 6, 2023, defendant pled guilty to counts 1 and 2, as well as to an amended allegation of personally inflicting great bodily injury under section 12022.7, subdivision (a). On January 11, 2024, the trial court sentenced him to the agreed-upon term of five years for the robbery, with the terms for the remaining count and enhancement to run concurrently. This timely appeal ensued.

## DISCUSSION

### I.    Legal Background

Section 1001.36 establishes criteria and procedures for a trial court to order pretrial diversion to mental health treatment. As originally enacted in 2018, the statute provided that a court may grant pretrial diversion if it

7

found all of the following: "(1) the defendant suffers from a qualifying mental disorder; (2) the disorder played a significant role in the commission of the charged offense; (3) the defendant's symptoms will respond to mental health treatment; (4) the defendant consents to diversion and waives his or her speedy trial right; (5) the defendant agrees to comply with treatment; and (6) the defendant will not pose an unreasonable risk of danger to public safety [as defined in section 1170.18] if treated in the community." (*People v. Frahs* (2020) 9 Cal.5th 618, 626–627 (*Frahs*); former § 1001.36, subds. (b)(1)–(6); Stats. 218, ch. 34, § 24.)  The court had discretion to grant pretrial diversion if all threshold eligibility requirements were met and the defendant and offense were suitable for diversion, and if the trial court was satisfied that the recommended program of treatment would meet the defendant's specialized mental health needs.  (*Frahs*, at p. 627, citing former § 1001.36, subds. (a), (b)(3) & (c)(1); *People v. Doron* (2023) 95 Cal.App.5th 1, 8 (*Doron*).)

Effective January 1, 2023, section 1001.36 was amended to " 'simplify the procedural process for obtaining diversion by presuming that a defendant's diagnosed "mental disorder" has a connection to their offense' and permit the court to deny diversion if the People rebutted the presumption." (*Doran*, *supra*, 95 Cal.App.5th at p. 8.)  The statute now establishes two criteria for eligibility for diversion and four for suitability. Specifically, a defendant is eligible for diversion if he or she has been diagnosed within the last five years by a qualified mental health expert with a diagnosed mental health disorder identified in the Diagnostic and Statistical Manual of Mental Disorders, and the mental disorder was a significant factor in the commission of the charged offense.  (§ 1001.36, subds. (b)(1) & (2); Stats. 2022, ch. 735, § 1.)  The statute specifies that such a mental disorder includes bipolar disorder, schizophrenia, schizoaffective

disorder, or post-traumatic stress disorder, but it *excludes* antisocial personality disorder and pedophilia.  (§ 1001.36, subd. (b)(1).)  At the time of the trial court's ruling on the motion for diversion—but not at the time of the judgment—borderline personality disorder was also specifically excluded, but in Assembly Bill No. 1412 (Assembly Bill 1412), the Legislature eliminated this exclusion effective January 1, 2024.  (Former § 1001.36; see Stats. 2023, ch. 687, § 1.1.)

If these *eligibility* requirements are satisfied, the trial court must consider whether the defendant is *suitable* for diversion.  (§ 1001.36, subd. (c).)  The defendant is suitable if (1) in the opinion of a qualified mental health expert, the symptoms of mental disorder related to the criminal behavior would respond to mental health treatment; (2) the defendant consents to diversion and waives a speedy trial; (3) the defendant agrees to comply with treatment; and (4) the defendant will not pose an unreasonable risk of danger to public safety as defined in section 1170.18 if treated in the community.  (§ 1001.36, subds. (c)(1)–(4).)  The defendant has the burden to make a prima facie showing of eligibility and that the defendant and the offense are suitable for diversion.  (§ 1001.36, subd. (e).)  If the defendant is eligible and suitable for diversion, "the trial court must *also* be satisfied 'that the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant.' " (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 892 (*Sarmiento*), italics added, quoting § 1001.36, subd. (f)(1)(A)(i); accord, *Frahs*, *supra*, 9 Cal.5th at p. 627; *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1079 (*Gerson*).)

If all these requirements are met, the trial court has discretion to grant pretrial diversion.  (§ 1001.36, subd. (a); *Doran*, *supra*, 95 Cal.App.5th at

9

p. 9.) This discretion must be exercised consistently with the principles and purposes of the law. (*Sarmiento, supra*, 98 Cal.App.5th at p. 892; *People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 891 (*Qualkinbush*).) The primary purposes are to reduce the likelihood that people with mental disorders will enter and reenter the criminal justice system while protecting public safety, to allow local discretion in developing and implementing diversion programs, and to provide "diversion that meets the unique mental health treatment and support needs of individuals with mental disorders." (§ 1001.35, subds. (a)–(c); *Qualkinbush*, at p. 886.) These purposes evince a "strong legislative preference for treatment of mental health disorders because of the benefits of such treatment to both the offending individual and the community." (*Sarmiento*, at pp. 892–893.)

We review the trial court's factual findings under section 1001.36 for substantial evidence, and its diversion eligibility determinations for abuse of discretion. (*Negron v. Superior Court* (2021) 70 Cal.App.5th 1007, 1016 (*Negron*).) To the extent an issue on appeal turns on statutory interpretation and the application of a statute to undisputed facts, our review is de novo. (*Ibid*.)

## II. Effect of Assembly Bill 1412

Defendant's first challenge to the trial court's ruling is that the trial court should have considered the effect of a recent amendment to section 1001.36, which broadened the range of disorders that may serve as a basis for mental health diversion.

Dr. Kelly diagnosed defendant with a personality disorder with elements of antisocial personality disorder and borderline personality disorder. At the time of the trial court's ruling on defendant's motion for diversion, both of these conditions were excluded from those eligible to serve

as a basis for diversion. (Former § 1001.36, subd. (b)(1).) But effective January 1, 2024, shortly before judgment was entered, Assembly Bill 1412 became effective, amending section 1001.36 to remove borderline personality disorder (but not antisocial personality disorder) from the list of excluded conditions. (Stats. 2023, ch. 687, § 1.2.)

The parties agree, as do we, that Assembly Bill 1412 applies retroactively to this case. (See *Frahs*, *supra*, 9 Cal.5th at pp. 631–632; *Doron*, *supra*, 95 Cal.App.5th at pp. 6–7.) If it appears that the trial court applied the wrong standard in light of the new law, we reverse unless the record clearly indicates it would have reached the same conclusion even if it had been aware of the current scope of its discretion. (*Doron*, at p. 10.)

It is clear from this record that the trial court would have ruled no differently had it had the benefit of Assembly Bill 1412 at the time of its ruling. The bill removed borderline personality disorder from the set of conditions that renders a defendant *eligible* for mental health diversion. (Former § 1001.36, subd. (b)(1).) But a defendant who has been diagnosed with one excluded condition may still be eligible for diversion if there is also a diagnosis of an included mental health condition that was a significant factor in commission of the charged offense. (*Negron*, *supra*, 70 Cal.App.5th at pp. 1009, 1016–1018.) Consistent with this rule, the trial court expressly found defendant eligible for mental health diversion based on his qualifying diagnoses, even though his personality disorder included elements of two then-excluded disorders. The presence of borderline personality disorder in defendant's diagnoses did not alter the trial court's view of his eligibility.

We are also confident that the trial court's conclusion that defendant was *unsuitable* for diversion would have been no different had borderline personality disorder not been excluded from the eligibility determination

11

when the court made its ruling. Defendant points out that, in expressing the need for a secure program, the trial court noted that defendant had ineligible as well as eligible mental health disabilities. But that was still the case even after enactment of Assembly Bill 1412, in light of the continuing presence of antisocial personality disorder among the excluded conditions. The court expressly considered whether defendant's mental health problems, including his personality disorder, would respond to treatment, and defendant makes no showing that it was improper to do so. Diversion may be ordered only "subject to" the trial court's satisfaction that the recommended program will meet the defendant's specialized mental health treatment needs (§ 1001.36, subd. (f)(1)(A)(i)), and defendant can scarcely argue that his specialized needs do not encompass the personality disorder that Dr. Kelly opined was a significant factor in the charged offenses.

Defendant argues that application of Assembly Bill 1412's amendments might have affected the trial court's assessment of whether he could receive effective treatment for his personality disorder. We see no basis for this argument. The amendment says nothing about how a court should determine whether a program will address a defendant's mental health treatment needs. And defendant raises no challenge to the evidence actually presented before the court made its ruling, which showed that personality disorders are neither directly treatable with psychiatric medications nor particularly responsive to counseling, but that their effects could be mitigated by abstinence from substances, substance abuse treatment, and antipsychotic medication.

We see no need to remand to allow the trial court to exercise its discretion anew in light off Assembly Bill 1412.

12

## III.  Risk of Danger

One of section 1001.36's criteria for suitability is that the trial court find "[t]he defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (§ 1001.36, subd. (c)(4).)  Section 1170.18 defines " 'unreasonable risk of danger to public safety' " as "an unreasonable risk that the [defendant] will commit a new violent felony within the meaning of [section 667, subd. (e)(2)(C)(iv)]."  (§ 1170.18, subd. (c).)  That provision, in turn, enumerates specific serious or violent felonies, colloquially referred to as " 'super strikes' ":  specified " 'sexually violent offense[s],' " certain sexual offenses against children, homicide or attempted homicide, solicitation to commit murder, assault with a firearm on a peace officer or firefighter, possession of a weapon of mass destruction, and a serious or violent felony punishable by life imprisonment or death.  (*People v. Jefferson* (2016) 1 Cal.App.5th 235, 242; § 667, subd. (e)(2)(C)(iv).)

The trial court found that defendant did not pose an unreasonable risk of committing a super strike if treated in the community.  Nevertheless, when considering what type of program would be appropriate for mental health diversion, the court explained that defendant required "a secure program," "something more than the usual inpatient treatment program," one with "adequate supervision" that would "assure the safety of the community," although not necessarily "lockdown supervision."  The court elaborated that it would require "a facility that's going to address the specific . . . unique combination of [mental] illnesses that [defendant] presents . . . in a fashion that ensures public safety."  That was because of the nature of the charged offenses, involving "random acts of significant violence on persons unknown to [defendant] in the community," which presented a "[s]ignificant level of

13

danger." As a result, according to the court, defendant needed "direct and significant supervision with medication in order not to be a danger out in the community to commit random acts of violence," for instance if he returned to substance abuse or failed to take his prescribed medication or comply with treatment. The court also explained that, for reasons defendant does not challenge on appeal, neither the probation department nor the Department of Health and Human Services would be willing or able to supervise him adequately in the community.

Defendant had been accepted into a residential program for 90 days at Waterfront, to be followed by outpatient services with weekly case management, and had unsuccessfully sought a long-term residential dual-diagnosis program. Defendant had attended Waterfront in the past, before the offenses at issue here, as well as an alcohol and drug program and anger management counseling.

The trial court concluded Waterfront lacked the capacity to provide the necessary level of supervision. Its opinion appears to have been influenced in part by the court's own experience in releasing to Waterfront another defendant who promptly committed a robbery. The court expressed its frustration with the lack of an available appropriate program for defendant, saying, "[i]t seems like there should be something for [him]. We are not simply going to keep him locked down forever, and . . . the only way he is going to function in the community is through some degree of ongoing supervision and medication compliance. But given where we are right now, and I trust that [defense counsel] has done his due diligence in evaluating available services[,] [i]t doesn't appear there is a suitable program given what [defendant] presents."

Defendant contends the trial court erred in relying upon public safety concerns that did not rise to the level of an "unreasonable risk of danger to public safety, as defined in Section 1170.18"—that is, an unreasonable risk that he would commit a super strike—in denying mental health diversion *after* it had found he was not at unreasonable risk of committing a super strike. (§ 1001.36, subd. (c)(4).)

A number of appellate decisions have considered similar contentions. Among them is the recent case of *Sarmiento*, *supra*, 98 Cal.App.5th 882, upon which defendant rests much of his argument. The trial court there found the petitioner met both of section 1001.36's eligibility standards, and, as to suitability, that she had consented to diversion and agreed to comply with her treatment plan. (*Sarmiento*, at p. 889.) But it nevertheless concluded the petitioner was unsuitable for treatment, both because of her past failures in drug treatment and because she posed an unreasonable risk to public safety. (*Id*. at p. 890.) This last finding was made, not based on a risk that the petitioner would commit a super strike offense, but assertedly within the court's " 'residual' discretion." (*Ibid*.)

The appellate court concluded this ruling was error. In doing so, it recognized that section 1001.36 allows a trial court to exercise its discretion to deny diversion even if a defendant makes a prima facie showing that all the express statutory requirements are satisfied. (*Sarmiento*, *supra*, 98 Cal.App.5th at p. 892, citing *Gerson*, *supra*, 80 Cal.App.5th at p. 1079, & *Qualkinbush*, *supra*, 79 Cal.App.5th at p. 888.) And the court must *also* be satisfied that the recommended treatment program will meet the defendant's specialized mental health treatment needs, a requirement that "appears to contemplate an ongoing assessment to assure that defendants will receive appropriate treatment for their particular conditions as part of the diversion

15

program." (*Sarmiento*, at p. 892; § 1001.36, subd. (f)(1)(A)(1).)  Even with all requirements met, the court may still exercise its discretion to deny diversion; however, this discretion must be exercised in a manner " ' "consistent with the principles and purpose of the governing law," ' " and the court's statement of reasons should reflect consideration of those purposes and explain why diversion would not promote them.  (*Sarmiento*, at pp. 892–893, citing *Qualkinbush, supra,* 79 Cal.App.5th at pp. 891–892; see *Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124, 134 (*Vaughn*).)

Applying these principles, the court in *Sarmiento* concluded the trial court erred in two respects:  First, it erred in concluding that the petitioner's past lack of success in *drug treatment* showed that a program to address her underlying mental health diagnoses of depression and post-traumatic stress disorder, coupled with substance abuse treatment, would not meet her specialized mental health treatment needs and yield better results. (*Sarmiento, supra,* 98 Cal.App.5th at pp. 894–895.)  And second, the court erred in deciding that residual concerns for public safety not arising to a likelihood of a super strike justified denial of diversion.  (*Id.* at p. 896.)

We are not persuaded that *Sarmiento* leads to the conclusion that the trial court here similarly erred.  Before deciding whether to grant a request for pretrial diversion, in addition to determining whether the six eligibility and suitability criteria are met, the court must consider whether the recommended treatment program will meet the defendant's specialized health care needs.  (§ 1001.36, subd. (f)(1)(A)(i).)  The court in *People v. Moine* (2021) 62 Cal.App.5th 440, 451–452 (*Moine*), explained that under this rule, even if a defendant does not pose an unreasonable risk to public safety as defined in section 1170.18, a court may still properly consider whether he or she can be safely treated in a proposed mental health facility.  And, as

16

explained in *People v. Bunas* (2022) 79 Cal.App.5th 840, 861–862 (*Bunas*)—where the defendant committed unprovoked assaults against two victims, at least one of them resulting in significant injuries—even if the charged offense is not one of those rendering a defendant statutorily inappropriate for diversion, the court may take into account the *circumstances* of the charged offense in deciding whether diversion is suitable.

The trial court's ruling was based on these proper factors, although it did not expressly refer to subdivision (f)(1)(A)(i) of section 1001.36. The court explained that, although it could not find defendant posed an unreasonable super strike risk, the charged offenses involved significant violence against random strangers, and as a result he required a "significant amount of supervision" initially. We cannot say this conclusion was unreasonable: the charged crimes included at least three unprovoked assaults on strangers, one of them causing a victim to suffer a broken jaw, a broken nose, and a fractured hip. The trial court could reasonably conclude that a program that did not protect defendant from committing further such unprovoked violence while he received intensive treatment for his mental health disorders did not meet his "specialized mental health treatment needs." (§ 1001.36, subd. (f)(1)(A)(i); see *Moine, supra*, 62 Cal.App.5th at pp. 451–452 [court may consider whether defendant may be safely treated in proposed program]; see also *Bunas, supra*, 79 Cal.App.5th at pp. 861–862 [court may consider circumstances of charged offense].)

The trial court did not conclude that *no* mental health treatment program could provide suitable diversion for defendant—indeed, it expressed its frustration with the unavailability of such a program. But for reasons not challenged on appeal, it appears that Waterfront was the only inpatient program then open to defendant. Apparently based on both the brevity of the

17

90-day inpatient program offered by Waterfront and the court's own experience of its level of supervision, the trial court concluded Waterfront's program was insufficient. Defendant asserts that Waterfront's program is consistent with Dr. Kelly's recommendation of a dual diagnosis plan of residential substance abuse treatment followed by "intensive" substance abuse and recovery services in the community. But it is worth noting that Dr. Kelly recommended treatment over a two-year period, and defense counsel acknowledged below that he had been unable to locate a long-term dual diagnosis program for defendant. On this record, we cannot conclude the trial court abused its discretion in concluding a 90-day program, followed by outpatient services with weekly case management, was inadequate in light of defendant's mental health treatment needs.

## IV. Correct Version of Section 1001.36

Defendant's final contention is that the trial court erred by relying upon an earlier version of section 1001.36, which established six eligibility criteria for mental health diversion, rather than the operative version, which divides those criteria into two for eligibility and four for suitability. While we agree that some of the trial court's comments were less than precise, defendant has not shown any reversible error.

As we have explained, section 1001.36 was amended effective January 1, 2023 such that the original six criteria for mental health diversion eligibility were divided into two criteria for eligibility (that the defendant is diagnosed with a qualifying mental disorder and that the disorder is a significant factor in the offense) and four criteria for suitability (that the symptoms would respond to treatment, and that the defendant consents to diversion and waives a speedy trial, agrees to comply with treatment, and

18

will not pose an unreasonable risk). (§ 1001.36, subds. (b), (c); Stats. 2022, ch. 735, § 1.)

Defendant contends some of the trial court's comments showed its ruling was based on the earlier form of the statute rather than the version then in effect, and he asks us to remand the matter for the trial court to consider his motion for mental health diversion anew under the correct standards. Specifically, at a hearing on July 25, 2023, the court expressed its concerns about the level of supervision defendant would require and said that it did not know if it should therefore find him ineligible for diversion. At a hearing a few days later, before finding defendant eligible for diversion, the court noted that it could not find that defendant posed an unreasonable risk of committing a super strike. (§ 1001.36, subd. (c)(4).)

As defendant points out, the current eligibility criteria address neither the necessary level of supervision nor public safety concerns (§ 1001.36, subd. (b)), and he argues the trial court's comments at the first hearing suggest it mistakenly believed these factors were relevant to eligibility. But regardless of whether the trial court's phrasing was inartful, it in fact *did* find defendant eligible for pretrial diversion. In the absence of any adverse effect on its determination regarding eligibility, we see no need for reconsideration of the question.

Defendant also contends that the trial court relied on improper factors in deciding he was *unsuitable* for mental health diversion. In a hearing on September 7, 2023, the trial court noted that it had not yet found defendant suitable for diversion and said that suitability would depend on a treatment plan. Similarly, during the October 9, 2023 hearing at which it denied diversion, the trial court stated that the issue before it was the "suitability of a treatment program for [defendant]." Defendant argues these comments

19

show the trial court applied the law incorrectly because the appropriateness of a treatment program is not one of the four statutory criteria for suitability. (§ 1001.36, subd. (c).)

Again, we see no indication that the trial court misconstrued the statute in a manner that affected the result. As we have explained, before ordering pretrial diversion, the court must be satisfied that the recommended mental health treatment program will meet the defendant's specialized needs. (§ 1001.36, subd. (f)(1)(A)(i).) Although this requirement is not framed as an additional criterion for suitability, it is indisputably a factor the court must consider before granting diversion. (§ 1001.36, subd. (c); *Vaughn, supra*, 105 Cal.App.5th at p. 134; *Sarmiento, supra*, 98 Cal.App.5th at p. 892.) For the reasons we have already discussed, we are satisfied the trial court appropriately considered whether the only program available would meet this defendant's specialized needs, and it did not abuse its discretion in deciding it would not and, on that basis, denying diversion.

## DISPOSITION

The judgment is affirmed.

TUCHER, P. J.

WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.

*People v. Roberts* (A169695)

20